May it please the Court, Cheryl Gordon-McLeod on behalf of Mrs. Pamela Moran, and I'm joined at council table by Pete Mayer, who's counsel for Mr. Jim Moran, and by Ms. Peggy SirGergens, who's counsel for Mrs. Grosnickle. The three of those appellants were consolidated early on and have filed a joint brief, and I will be arguing for all three. I'm also joined by Mr. Ness, who represents Mr. Anderson, who had filed a separate brief with no overlapping issues, and he'll be arguing separately. My goal, I'm certainly prepared to address any of the issues in the brief. My goal is to certainly discuss the preclusion of the good-faith defense issue, the experts' testimony about the sham transactions, and the severance issues. If I get there, I'd like to touch on courtroom closure, if not, not. But to begin with the ---- That's a lot. Why don't you start with this exclusion of the evidence regarding the good-faith defense. Thank you, Your Honor. This is based on the Court's exclusion as hearsay of evidence proffered by Pamela Moran during her direct examination and her redirect examination. You say on the basis of hearsay? The government objected on the basis of hearsay. The Court sustained the objection on direct without stating a reason, and the Court sustained the objection on redirect, I believe, fairly read on both grounds of hearsay and 403. I thought the original objection was on 403 as well. That is, he incorporated his earlier statement that it was 403. I'm sorry. Are you asking if the original objection was on the basis of 403? The original ruling was on the basis of 403. Well, the language of the Court's ruling, and I'm looking at ER 660 and 661, and this is on redirect, is after the government objected on the basis of hearsay, the Court said, quote, testimony of that type will have to come from the person who gave the advice and will be subject to cross, close quote, which I take as a hearsay ruling. The Court continued, quote, I'm not going to admit that through hearsay through 403, close quote. So the objection was on the basis of hearsay. The Court's comments referred to the fact that he felt that Pamela Moran testifying to this was secondhand testimony, which I take as a hearsay sustaining of the objection, and the Court concluded with a reference to Rule 403 but with no balancing on the record. So not to ---- Let's take them one by one, because it is totally confusing as you read the transcript. He mixes and matches. If the objection were on hearsay, and you've argued that it goes to a good-faith belief, and therefore the hearsay objection would be inappropriate because of the state of mind, would it matter if it were double hearsay? Yes, it would matter if it were double hearsay. And there might be an appropriate objection to double hearsay. But I want to clarify that it wasn't double hearsay. We have the testimony on direct examination, and that's ER 640 to 641. And there, Pamela Moran is asked partly about double hearsay, as I have told her, and she answers partly with direct testimony. My clientele has ---- sorry. The first category was what her clients had told her that their professionals had told them. And that, I believe, is what you're talking about, is double hearsay. She also said, my clientele says this, and they are educated professionals. So that's Pamela Moran's direct testimony about whom she was relying on. I think this becomes more clear in her redirect testimony, and that's ER 660 to 661, where the question ---- where the answer is clearly from Pamela Moran, there were several of these, quote, several of these professionals upon whom we relied. And she says ---- she refers to them as the attorneys who gave them opinions without the interface of the attorneys telling the clients anything. So, yes, I think it matters, but I think the transcript is clear, both on redirect ---- both on direct and certainly on redirect, that what she was testifying about was what professionals had directly told her. I'd also like to point out that the government, in its brief at pages 29 and 30, concedes that its own objection at trial was on the basis of hearsay, and concedes that that was the wrong objection, concedes that this material was not hearsay. If there's one case that I can point you to to read on this issue, it's the Bishop case from this court in 2002, which clearly says that the only direct evidence of Pamela Moran's good faith is what comes from her lips on her examination, and that for the expert to come in and testify, that would actually be the secondhand testimony. So I think we've got Pamela Moran proffering on direct and redirect, non-hearsay, firsthand evidence concerning her good faith belief. We've got a government objection on the basis of hearsay and the trial court excluding it, perhaps on the basis of hearsay, perhaps on the basis of 403. Does the court ever do any balancing on the record? There's no balancing ever done on the record. And again, I think the pages to look at are 640 to 41, and then ER 660 to 661, where the objection and the court's statements take place. There's no balancing. What the court's statements are about is what's firsthand and what's secondhand. And the court erroneously says, bring in your firsthand witnesses, when the firsthand witness was actually testifying. What is the standard of review that we have cases that suggest if there was no balancing, that it would be a de novo rather than the typical evidentiary abuse of discretion? So what the judge said here seems to me fits somewhere between just saying Rule 403 and doing balancing, because the judge says, well, the probative value is outweighed by the potential for prejudice. So my question is, what is your view on the standard of review? Well, I think it's de novo for two reasons. One is the cases that say that construction of the hearsay rule, just like construction of a statute, is reviewed de novo. And I'm looking at Mahoney v. Layman, Ninth Circuit case from 2003. And I think what we have here is the district court's construction of the hearsay rule. Because the district court judge is pointing to the wrong person as the source of the first or secondhand testimony in this case. So I think it's an erroneous interpretation of the hearsay rule. And construction of the hearsay rule is de novo. I also think it's de novo for a separate reason. And that is, the district court's ruling eliminated Pamela Moran's defense. It was a good faith defense of reliance on outside professionals. It was the whole ball game for her. It was her key defense. Under the cases concerning the right to present a defense, which is of constitutional magnitude, review is also de novo. I should- Let me ask you about that. Hadn't she put in some evidence concerning good faith belief before the testimony was cut off? Yes, your honor, she had. What she put in was testimony that she had relied on the following people. Wayne Anderson, Keith Anderson, Richard Marks, the pro se defendants sitting next to them, and Roosevelt Drummer, who had previously pleaded guilty. So what she was allowed to put in as part of her good faith defense was reliance on the most suspect people, the co-defendants and the guy who'd already pled guilty, as well as the fact that she did her own research through the code. What she was precluded from putting in was evidence of an entirely different quality, that is, evidence of reliance on outside professionals, rather than the insiders that were tainted by AAA. Did she ever make an offer of proof as to what evidence she was going to put in, if permitted to do so? Your honor, she did not make an offer of proof. I'm relying on the question that was asked in the record, 640 to 641 and 660 to 661. The sidebar, the objections and the court sustaining it. She made no further offer of proof other than her statement that we relied on several outside attorneys' objection, and that was the end of it. I should add that this issue brings her husband, Mr. Jim Moran, into the fold as well. If you look closely at the testimony that the defense elicited, Mrs. Moran is using the word we on pages 640 to 648. And this is where she's talking about her good faith defense. We know that she's not using it just as the royal we or as a way of referring to herself, because when she's referring to herself alone, for example, her research through the Internal Revenue Code herself, she uses the word I, not the word we. I should also point out that the government lumps Mr. and Mrs. Moran together for purposes of what they knew and what they believed when they questioned her on cross-examination about whether she had received the letter from Attorney Hayes, which gave a negative opinion of AAA. They referred to the letter that was sent to you and your husband, Mr. Moran, and whether they had seen it. So the use of we was not inadvertent, and I believe that this claim covers Mr. Moran as well. I'll move on to the experts' testimony that these tax set-ups were shams. And this is the government's experts' professor, Sherman, who began his testimony by stating, quote, in my opinion, the look forward is a sham. This is ER at 409. He continues shortly thereafter that the essays, the Costa Rican Sociedad Oninemas, are a sham. That's at 412. And then he says the look backs are also a sham, and that's at ER 415. Our counsel and defense counsel's expert said it's not a sham and went into reasons. So we've got a counter to what was put in by the government's expert. We do, in response, and in response and thereafter the government's expert did say that. The main difference between the two experts is that the government's expert relied on both the formal structure, as well as how that structure had been applied or used by the people. And to do that, he looked at the testimony of particular witnesses. He didn't do his own investigation. He testified, and I think this is ER 409, that he looked at documents, some grand jury transcripts that the government provided to him, and he listened to testimony, testimony up to the time that he testified in court. The defense expert, in contrast, was giving a summation based on the law, saying that these forms are fine if they're applied correctly. I guess I'm having now trouble understanding what the precise objection was. First, I read the briefs to think it was because they were using the term sham, and then because the expert was somehow incorporating other data or testimony within the expert's testimony. So maybe you could narrow what is the actual objection to the government's expert. My two key objections that I'm raising on appeal are these. One is that he gave a legal conclusion calling the three forms shams. And two is that he based his legal conclusion selectively on witness testimony that he believed while not basing it at all on other witness testimony. Okay. Well, let's go to the second one first. And isn't that precisely what goes to the weight rather than the admissibility, the second point of whether he cherry-picked what he decided to include in his opinion? Well, the second point, I think, is essentially vouching. If an expert is going to selectively choose what to rely on, he can do it if that's within the scope of his expertise, if he's done an investigation, and it's within the scope of his expertise to credit this or that because of his experience. That's not what happened here. He sat in the trial through the portion of the government's case-in-chief and was given grand jury testimony selectively by the government. He's not an expert in credibility. He's an expert in tax law, yet he selectively chose to credit those things that he had been given and not to credit other testimony. For example, are we borrowers really on the hook for the loan? He credited the testimony of the borrowers who said, no, I never thought I'd have to pay it back, and discredited testimony of borrowers who said, yeah, I thought I was going to have to pay it back. So he was, yes, it's within the scope of an expert to be selective within the sphere of his expertise, but credibility was not within the sphere of this expert's expertise. Well, couldn't the expert select evidence that supports his theory and then let the other side argue whatever they want to argue about the other testimony? Well, if he made it clear that he was giving a selective conclusion based on his decisions about the credibility of certain witnesses, I don't think he can be selective in vouching for certain witnesses, underscoring the government's belief that certain witnesses are testifying truthfully and rejecting others. Well, did he ever say, I believe this witness and not the other witness? No, Your Honor. He did not use that language. He listed the testimony that formed the basis for his opinion, which was witnesses who believed that they were not on the hook for the loans and that they never expected a profit. And he simply didn't list witnesses who had testified to the contrary. I think the case that this parallel is going to. But they wouldn't support his theory. Well, I think. You know, isn't that the classic cross-examination, that is, well, you listed these 12 people that supported but, you know, 25 people testified on this subject, and you didn't list anybody who disagreed with you. I think there's a limit to what an expert can testify to when he's giving a legal conclusion and when he's making those credibility determinations. And the case that he's going to testify to a legal conclusion is not going to be a legal conclusion. And I'm having trouble because you're really, in this case, it has this added element of vouching. I mean, that really is what's underlying, is that you're suggesting that he's basically putting stars behind witnesses' names indirectly. Isn't that essentially your argument? That's exactly the argument, Your Honor. Or I should say that's exactly half of the argument. The other half of the argument is that he's testifying to a legal conclusion. And that is that the sham point? That's correct. Or is it the overall conclusion? That's the sham point. That's the fact that he didn't testify hypothetically that a corporation or with such and such a structure used in such a manner would be a sham. He testified, look forward is a sham, look back is a sham, and the essays are a sham. And that was the key question before the jury. We know that because there was a jury instruction on it. ER 688 has the jury instruction telling the jury how to figure out if something is a sham transaction or has economic substance. Based on the expert's testimony, they didn't have to figure it out at all. It was delegated to him. I thought that the instruction required them to find certain elements in order to find for the government on the sham issue. That is, they weren't just told that you could find that it's a sham or not a sham, but. Right, it wasn't a directed verdict on sham. I understand that, but the jury was instructed to find specific elements, that they would have to find specific elements in order to find for the government. That's correct. They were directed in the instruction that they needed to look at economic, whether there was any economic substance to the transaction, et cetera, in determining whether it was a sham. Those were the steps that Professor Sherman took for them. And his conclusion was that it was a sham. So I think it's an example of the expert telling the jury what to do with that instruction to find that it was a sham, that being a legal conclusion. I mean, like in criminal antitrust cases, that's precisely what experts testify to all the time, is that basically the economic validity and structure of a transaction. Why is it any different here? Well, typically what the expert can testify to, based on his expertise, is, based on my knowledge of the relevant statutes and based on my knowledge of this, of such and such elements of a structure, that would not be permissible. What this expert testified to was, I sat in court with the government at counsel table for the last two and a half weeks. I listened to what these people were really doing. And based on what these people in the government's case say they were really doing, it was a sham. I think that's completely different because it's crediting their witnesses and coming to a legal conclusion based on it. Tell me again why we shouldn't be thinking that this is kind of something put into equal poise by defense's experts saying this is not a sham and giving the reasons. Well, I think the defense's expert was fair response to what the government said. I think the key difference between the government expert's testimony and the defense expert's testimony was the government expert's vouching. And again, I'd refer you to the Scobb case from the Second Circuit, talking about how the vouching problem interfaces with the legal conclusion problem. I'm running a little low on time. I'd like to touch briefly on severance before I turn some time over to Mr. Ness. Mrs. — the Morans and Mrs. Grosnickle were joined for trial with pro se architects of the tax fraud scheme who had prejudicial courtroom conduct, who had additional charges, antagonistic defenses, and a ton of unrelated 404b material that was admitted against him. A trial — the Eleventh Circuit has said a trial involving a pro se defendant and co-defendants who are assisted by counsel is pregnant with the possibility of prejudice. I think that prejudice came to fruition here because of the spillover effect of the 404b, of the greater evidence of culpability of the pro se defendants as compared with the represented defendants, because of the spillover effect of the pro se's courtroom conduct. And I'd like to say a little bit about the 404b evidence. This was evidence that was relevant only to the pro se's, and it was pretty out-there evidence. We've got Scott Salmon talking about the 1990 fraudulent trust with the tinfoil packets of currency getting sent back and forth, and we've got Agent Dowling talking about, in 1998, this money laundering scheme to get money out of New Jersey to defraud the bankruptcy court in an offshore bankruptcy scheme, and he's presenting this as a historical antecedent to AAA. The 1990 stuff is clearly remote in time. Both of these 404b bits of evidence are dissimilar money laundering acts from the time that our clients were charged with. They involve different people than our clients, and it was extensive evidence that was complex and constituted a variety of frauds. Under the case law of this circuit, evidence of prior crimes is the evidence that is most difficult to get the jury to compartmentalize and ignore. And I'm referring to cases as diverse as the firearms, the possession of a firearm case, Lewis, and the death penalty case, Jeffries v. Wood. All of the cases recognize that evidence of prior criminal history is most difficult for the jury to ignore, even with proper instructions. In this case, the only instruction was at the end of the trial, and the testimony took up, which I believe that the government concedes was inadmissible as to these  In addition, there was a spillover effect of the conduct of the procés at the trial, and that's a little bit difficult to get a handle on on appeal. But I do want to point out to you the district court's own comments saying that he denied severance in part so that the jury could see the antics of the procés in court and see who the represented defendants chose to associate with. And that's in the ER at 580 to 81 and also, again, at 700. There's no legal basis to do that, and there's no factual basis to do that. There's no legal basis to do that because the procés' antics in court, when they're not on the witness stand, are not to be taken as evidence, and because there's no such thing as guilt by association. There's no factual basis to do that because the procés didn't conduct their business near the represented defendants. Pamela and Jim Moran were in Montrose, Colorado. Mrs. Grossnickle was in Hoodsport, Washington. Richard Mark's procé was in Sacramento, California. One of the Andersons was in Costa Rica, and the other Anderson was in California. So there was no factual basis even for the district court to lump them together and to expect the jury to see that the procés' conduct should be attributable to these represented defendants. I'm going to stop and turn my time over to Mr. Ness. If there's any remaining time, I'd love it for rebuttal. All right. And how much time had you intended to reserve for rebuttal? I'll leave that up to Mr. Ness. I'd like to have two to three more. Were you trial counsel? No, I was not trial counsel. Good morning again. Ron Ness on behalf of Wayne Anderson. Mr. Anderson represented himself at trial, which is one of the issues that I raised in my brief, which is whether or not the court should have allowed Mr. Anderson to represent himself. It's very troubling for in a case such as this. If you read the transcript, the judge obviously was on the horns of a dilemma. What do I do with somebody who will not accept an attorney that he says is being paid by the government and therefore has a conflict? Well, you said he wouldn't accept any lawyer in the state of Washington. Right. Because they're all what have been appointed attorneys who were paid by the government. This is an attempt to just halt the trial, to disrupt it. He says, I'm not going to represent myself and I'm not going to be represented. So what does the judge do? Well, I've got – I think that issue also segues into what the other issue, which is whether or not this individual, the judge, should have had him evaluated for competency. Well, here we know that he was operating a kind of a sophisticated, misguided operation. It was kind of complicated and he'd shown himself to be at least competent to do all that. So then he comes into court and tries to make himself look like he's nuts. So what's a judge do with that? Well, the simple solution is to have him evaluated as to whether or not under the law he's competent to either assist an attorney, which means he has to know and understand the nature of the charges against him and have the ability to assist, or that he has the necessary competency to represent himself. Well, if you're sitting there, now the judge has made the decision to move forward with the trial. And so then you look at the trial transcript and see his participation in the trial. He has some unusual views. There's no doubt about that. But that doesn't make him unable to participate. It seems he does participate in the trial. So doesn't that really kind of contradict that the judge should have had some big red flag at that point to say, well, I better halt these proceedings and get a competency exam? Well, I agree he participated. But whether or not he knew and understood and appreciated the nature of the charges against him, I couldn't tell from the transcript whether that was true or not, because he was... That right there tells me, being on appeal, if you have that situation and he goes to trial and the judge was there and watched this, and we don't have any evidence on the transcript that would make you think he wasn't keyed into the basics of the trial, what would be the basis on appeal for overturning that? The only basis is his, and I think it's continued until this day, his views regarding his obligations under the laws of the United States. And it was clear that he didn't feel he was subject to certain laws based on his ethics in court. And I think in excess of caution, so to speak, that the best way for the judge to proceed is to say, number one, that you're competent. Then if you're going to represent yourself, I've got that knowledge that you have the ability intellectually to do that. Maybe when he was in trial, he was able, according to the government's brief, to cross-examine and ask questions, but I don't necessarily think that means anything other than he knew about what it is they were trying to say he didn't do in terms of that particular issue. And that goes right down to whether or not he should represent himself. And as I said earlier, the fact that he would not accept an attorney, on the other hand, he said, I can't, I won't represent myself. I'm not even, he said, I'm not even this person that you say I am. I have a different name, et cetera, et cetera. And at one point, the court appointed standby counsel. Then I think it was the third hearing where they discharged even standby counsel. And I think that would be troubling in and of itself, because standby counsel is there to assist the individual if that's what they ask for. Whether or not, I mean, I've been standby counsel many times, and I've sat there and not said one word. And there's other times where as soon as you get into trial, the defendant goes, oops, I need some help. And I think that's troubling that the court dismissed standby counsel at the very least, in a case such as this, where the individual made it clear that, or at least equivocated as his desire to represent himself. But I want to leave this to cloud with some more time. All right. Thank you. Please, the Court. I'm afraid my voice is very thin, so I will talk as loud as I can. Addressing the Wayne Anderson issues first, it's clear from the record that he was not going to accept counsel who was a member of the Washington State Bar, no matter what the judge tried to do. The magistrate judges tried to convince him that he was in his best interest to use counsel, that this was going to be a complicated case, that there was a lot of issues, but he simply refused. He was, as you said before, he was attempting to manipulate the system. He didn't want to go to trial. He wanted what he called counsel, who apparently was someone not a member of the Bar, someone who was basically going to tell him what he wanted to hear. And there is no right to that. It's also, given his consistent refusal to accept counsel, there was no reason to continue stand-by counsel after the third hearing. He simply refused to work with stand-by counsel. There was nothing that he was willing to listen to. He wasn't accepted. He was not willing to accept help. There simply was no reason for anything else. It's clear he waived counsel. And we believe that the fact that he knew what was going on, you can tell from his cross-examination, dealing with issues that were at the – dealing with matters that were at issue in trial, we addressed those at pages 22 to 25 of our brief. If the Court has no further questions on Wayne Anderson, I'll move on to the other side. Taking first the testimony, the proposed testimony of Pamela Moran, if you – on the direct, as counsel – I mean, counsel has conceded that double hearsay is a problem. If you look at page 7 – page 640 of the excerpt of record, starting at line 12 – starting at line 11, question. Any other reasons why you believe it was legal? Answer. Well, for example, one thing, the clientele that we were speaking to, they were all professional people – doctors, dentists, chiropractors. You know, they were – they were people of high intelligence, and they all believed in the legality of the plan. Our planners, our CPAs, they believed in the legality of it. We felt very secure. We just felt very secure. And then also, a lot of the clients had received opinions from outside CPAs. Government objected – objection hearsay. The Court sustained. At that point, we then – counsel asks, did your clients tell you what their outside professionals – the Court. That is the objection I sustained under a Rule 403 analysis. That's clearly double hearsay. That is not an instance where Pamela Moran was attempting to talk about other tax professionals. So I think it's fairly clear that the direct – the matter on direct is – was clearly excluded, was properly excluded. Perhaps the judge could have said more as to why it was a 403. Well, was he also excluding her statements that the clients thought it was okay and that they were sophisticated? Well, as I understood counsel's argument, she was saying that not only was – not only was Pamela Moran talking about what the clients had told her and their professionals had told them. Well, so part of it should have been admitted and part excluded. Is that right? Well, not the direct portion because she's talking – what she's talking about is what her – what the outside professionals told her clients, which she then said told her. That's the double hearsay that counsel said is the problem. No, but she said that her – these clients were themselves sophisticated and that they must – She said that they were professional people – doctors, dentists, chiropractors. Yes. She's not talking about people who are experts in tax law. She's not – she's talking about people who are just well-educated. The fact that someone's well-educated – I mean, I may have a Ph.D. But that would be admissible, would it not? It goes to the weight as to whether their own opinions were – Well, the problem, I think, Your Honor, is that she's not actually hearing from the professionals. She's hearing secondhand from her clients what her clients say the professionals told them. But there are a myriad of problems there because we don't know what – excuse me. I need to get some water. We don't know what her clients have told the professionals, and there's no way for anyone to cross-examine them. So we're – you have to take everything at sort of face value, which – this is very unlike Bishop, because in Bishop, you have the defendant actually hearing what the   was error to exclude that. Here, you don't have that, at least not in this portion, not in the direct portion of the examination of Pamela Moran. You have – she wants to testify as to what other people told other people. That's double hearsay, and counsel said that that's a problem. So I think we can – I think we can take care of this part without a problem. You then move to – But then there are a number of instances where she's trying to say what the CPA said or what she was told by the CPA, and the court excludes that as either hearsay or 403. I don't believe that's – is that part of the direct testimony? I thought that came up in redirect. Because I'm – I mean, I'm looking at – Maybe it came up on – well, why would it matter? Well, it's just – she doesn't – if she doesn't get to go there, basically  it means that it opened it up on cross. But that wasn't – that's a scope of the – that's a scope of the cross objection. It doesn't have to do – I mean, the objection then is you've exceeded the scope of the cross. That objection wasn't made. The objection that was made was hearsay by Ms. Tongreen. I think it was just an objection. I'm not sure it was hearsay. It was just a general objection. Well, I don't know. He just said it. It's hard to keep track of those. Objection, period, hearsay. Okay. Is that – are you looking at page 640? Because this is – That is page 660. 660. Okay. That's – okay, that's the redirect portion. Right. Okay. I was just dealing with the direct portion at that time. The redirect portion, in the first place, I don't think the government opened the matter up on cross. Well, Mick, help me out. Maybe I'm too far out of trial practice, but I'm – I'm having a little trouble. I practice myself. I'm not sure how much I can help. Okay. Well, having spent 25 years doing it, I'm at a loss to understand your objection, okay, because – because we have the objections that are on the record here. Right. And it's not a question of going beyond or opening it up. It's a question of is the testimony admissible? It may be if you tell the judge what it's being used for. In this instance, there was no indication that the objection – well, the response to the objection was the jury was going to be left with the impression that she only heard from one – that she only heard one other expert. She never – there was no proffer to the judge that, Your Honor, this is being used to establish my state of mind, good faith belief. And this is a – this is clearly a tricky area of the law. Well, let's – let's just start with basic principles. Do you agree that to the extent that testimony is used to – that relates to state of mind, that it would then not be excludable as hearsay? Probably. I mean, it depends. I mean, if we're talking secondhand hearsays, what someone told someone. We're talking about a single-level hearsay. Single – a single-level objection. I think Bishop took care of that. If the person is hearing it and it goes to state of mind, I think it's fairly clear that that is admissible. And then in tax cases, there's cases that say that – that advice that you get or that you rely on is in fact the kind of evidence that comes in that goes to state of mind. Is that correct? That's correct. So therefore, if the judge excluded testimony that was first-level hearsay that was offered not for the truth of the matter but for the state of mind, it would be an abuse of discretion to exclude that hearsay, would it not? Probably, assuming the judge is made aware that that's the use that the testimony is being put forward for. Well, what the judge says is, counsel, let me add for the record, any testimony that – of that type will have to come from the person who gave the advice and who will be subject to cross-examination. And then he goes on to say, I'm not going to permit it in through hearsay. That is what the court says. Yeah, that's what he says. That's what the printed – that's on the printed matter. So I'm not going to disagree. So the judge is misapprehending the hearsay rule, basically. I think they have to say yes. Assuming – yeah, the judge could be assuming – assuming that the judge is aware of what the testimony is being put – the use for which – to which the testimony will be put, then, yes, the judge is misapprehending the hearsay rule. Unfortunately, I mean, this is an area of the law that is messy. I think it's standard for both defense counsel and government counsel when you hear someone say, he told me that, you stand up, objection, hearsay. I think part of the problem is that then the opposing counsel doesn't get up and say, Your Honor, we're offering this not for the – Well, here's a page that Ms. Costello says, Your Honor, just for the state of mind, not for the truth of the matter. The court, well, she's gone beyond the question. So the judge is aware that that's what is going on here. I think certainly by the second time, yes. Well, at least he's aware in this case because she has told him what it's being used for. Before this point in time, it's never been directly stated to him that it's being used for state of mind purposes. Well, but in this part, they say, look, this haystuff came in. And so she wants to show that she had other advice to her. And the judge, they keep saying, no, no, no. But the judge did, of course, give the defendant another avenue and basically invited the defendant to bring other people on whom she claimed to have relied. Right. But the – but you're not actually obligated to do that if you've got somebody – if the government is saying, well, this person said such and such. I realize that. I'm just saying that, I mean, the district court did do that. Well, the same colloquy in which the judge makes the erroneous statement about hearsay, he also says through four or three. So what's the effect of his adding four or three to the ruling on hearsay? Well, I certainly think it helps my side of the case. Well, that's what I wanted to ask you. How does it help? Well, I – it goes to sort of the more confusing than probative. I think partially it would make more sense – it's a difficult – it's a difficult area. But I think the court is saying, you've also had – we've also had extensive testimony by this time about the people upon whom she's claiming to rely, about all the materials upon the Internal Revenue Code, her study of the code. There's been an awful lot already put forward in terms of her reliance, on her belief that what she's doing is not – So it's redundant. It can be argued that. Right. But you see, I hate to put in fine points of evidence, but that is an issue of cumulativeness, which is different than prejudice. So – It is. And that may be – it may be cumulative and – Well, the court doesn't say – What the court said was prejudice. So without articulating why there's any prejudice. So I don't know – you know, you didn't make the transcript, okay? So we're just – obviously, you're just trying to help us through the appeal. So we're not suggesting that you were there making this transcript. I didn't take it personally. As counsel for the government, even. But the point is that when the judge just says prejudice versus probative, it's a little hard for us to review. I understand. This is – I mean, this is a single item in a, what, 37-day trial, almost a 4,000-page trial transcript. No trial is perfect. A defendant is entitled to a fair trial. Defendant got a fair trial. But there is no such thing as a perfect trial. I certainly know there's no such thing as a perfect oral argument. In fact, the judge said at some point, it'll be a miracle if I can get through this. Yes, he did. He recognized that there were an awful lot – and he was also – I mean, there were lots of defendants, lots of issues. Right. There was a lot of – there were some antics that was not an easy situation. Well, tell me what evidence there was that she couldn't have believed any of this stuff. Now, she testified for a long time about how she tried to study the code herself, and she relied on Roosevelt. Yes, Roosevelt Drummer. Yes, Roosevelt Drummer. And she did all of these things. That's what she testified. Of course, she had previously filed returns for a long time. Is that the basis that she couldn't be in good faith because she wasn't filing returns herself? No. I mean, that's just – and one of the factors that you consider in terms – in deciding whether or not an action is willful and knowledgeable is a prior history of having filed returns. And she had filed returns in the past. Now, the only evidence, really, that the government had that she should have been suspicious was this Hayes letter. That's the only thing they put in. And she certainly had the right to counter that, and she was prevented from doing that. I'm not sure the Hayes letter was the only thing – had the only evidence that – I mean, there were certainly – you had the types of statements that they were making in their presentations that any reasonable person can just sort of conclude that the claims are silly. Well, that's – if she believed them, they could be silly. If she believed them, that's right, but still, it's a jury question. It's for the jury to decide whether or not she believed them. I mean, I'm always amazed at the people who invest in these things, but they do. So – Well, so are we, unfortunately. I know, but she's actually more in the nature of training and advice than – you know, she's even at a higher level, I recognize. What do you say about the sham issue? The sham issue, it's entirely proper for an expert to testify about what evidence excludes – what the evidence viewed in – the witness can pick and choose. The witness can cherry pick. There's no – there's no – there's nothing that says the witness can't say, well, based on what I've heard, I – it's my opinion that – and that's essentially what he did here. I guess the question then is if – even though you could cherry pick, and if that weren't vouching, it was just for talking purpose to say it's not vouching, but the conclusion you make is tantamount to the whole ball of wax of the trial. In other words, it's a sham transaction, which is code words for saying it's illegal and you are defrauding the tax authorities. Can you go that far? You can't go that – the problem – I mean, there's another step. That's not the whole ball of wax. You still have to find willfulness. You have to find – you don't – the fact that it was a sham doesn't decide the matter. Is that a legal conclusion, however? That it's a sham – that it's – if it's a sham, well, then I think, as Judge McEwen suggested, then all of the antitrust cases that come before you need to be – need to go back, because he just picked a word. And then basically he's saying whether it's – whether it's illegal or illegal, whether it's real or not real. And the only way you can do that is sort of you look at the factors. Is this really what happens? If it's not really what happens, then it's a sham. But are all the cases seem to be – it's a very messy area, but the cases seem to say that you cannot – you cannot give a legal conclusion. Well – And what is that sham if it isn't a legal conclusion? Because the judge goes ahead then and instructs as though it's a legal conclusion. Well, I'm not sure that the way that Professor Sherman was using it was as a legal conclusion. Basically, he's just saying it's not real. And how is it to say that it doesn't work the way it says it's supposed to work? I'm not sure that – it's – I mean, it's a tricky area, what's factual and what is legal. The fact that, I mean, my brief is – this brief is read, that's factual. But I think you can argue that whether something operates the way it – whether something is what it says it is, I'm not sure that's legal. I think that might be a factual determination. Are there any cases that tell us what it is? None that I could find to fit in my – to fit inside my page limit. If you had more pages, you would have found more cases? It's always possible, Your Honor. If I had more pages, I would have been able to read them. But you would have stuck the best one. You would have – even if you had more pages, you would have stuck the best one in here, right? I mean, I would have tried. Okay. It's just that we don't see any case where this kind of language comes up to try to guide us on whether it's legal or factual. You get to make law. Would you like me to address just briefly the Joinder question, the severance issue? If you'd like to, questions? No one looks particularly interested. Well, there's a lot of issues here where we're interested in all of them, but some are more difficult than others. Yes, they are. I think just – I'll just briefly. The evidence was not extensive. I mean, the claim, the 404B evidence was very discreet, very – it occupied a very small amount of time in a long trial. And it's certainly – it's hard to read it to be nearly as oppressive and awful as the defendant would like it to come out. I mean, you have the testimony of Salmon. That's really quite an – I mean, talking about what happened in 1990, I think a jury properly instructed, as this one was, is going to understand that that's not something that they're going to consider against the counsel defendants. And contrary to what the defendant said – the defense counsel said, I believe there was a limiting instruction shortly after the end of that testimony. As to the testimony by the agent, again, it was not – it related only to two marks. There was only one reference to AAA. The jury properly instructed is simply not going to – there's no likelihood of spillover. What about the judge saying that the reason he really thought he shouldn't give severance is because he wants the jury to see these really kooky people, and how could these others have believed them? I think that was a tired judge, frustrated probably with the extent of things. The judge never was indicating that he was attempting to punish the defendants. I think it's clear based on all of the – the whole trial that the judge was being scrupulously fair in making sure that they were joined properly under the rules of criminal procedure. Most of the evidence in the case dealt with AAA, in which all of the defendants, counseled and uncounseled, were involved. This was a very long case. I mean, you can – you can tell that trying – trying this once was bad enough. I mean, to try it twice is not something that – absent a clear demonstration that they did not receive a fair trial, the defendants don't – and the defendants didn't do that. So I believe on this record you should affirm. Before you go, I do have one question. Sure. Go back to Mrs. Moran. Okay. Just for – if we were to accept her argument on that this evidence was improperly to ride her coattails. No coattail riding, Your Honor. Whether or not she was testifying as to what we believed, only an individual's belief is that issue. She may say what someone else believes, but that's not really – the jury can't – that's not something for the jury to consider. The defendant – I mean, if James Moran wanted the benefit, he needed to take the stand and offer his own belief as to what – what it is that is in his thought process. One person can't testify about another – another person's thought process. Certainly not credibly and certainly not to an extent – sorry, where – where you should reverse. I'll sit down. Good. Thank you. You got all the way to the end without losing your voice. Ms. McCloud, you may have two minutes of rebuttal. Well, just a quick response to the notion that it was simply a tired judge making that comment. He actually did it twice. He did it at ER 700 in the sentencing and he did it at ER 580 to 81 during the trial, so it seems to have been a considered decision. To touch quickly on the expert testimony, to say that the expert just picked a word sham is, I think, incorrect. And I'd refer you to the United States v. Scopp case, which I think is the case that says that when the expert gets there on the stand and tracks the language of the statute and the relevant cases, and in fact corrects himself to use the language of the legal cases and the statute in order to draw his conclusion, it's a key sign that he's drawing a legal conclusion for the jury. The final thing that I wanted to touch on was the 403 issue. The district court judge did say 403. It's not 403 whether or not the district court said it. 403 is balancing appropriative versus prejudice and confusion and stuff. Was it prejudicial, this stuff that Pamela Moran wanted to testify to? No, actually it was the only first hand testimony that there could be about her good faith reliance. Everything else might have been cumulative and might have been prejudicial because it was second hand if the experts had come in and said what they told to Pamela. But what she herself said was the only first hand direct evidence. Was it cumulative? No. It was totally different in quality than anything to which she had been allowed to testify. It was undisputed that she relied on the pro ses, the nutty ones who were sitting next to her. What she wasn't allowed to tell the jury was that she relied on people who were outsiders and who were untainted by a connection with AAA. So even under a 403 analysis, the judge was wrong. Thank you, Your Honor. Thank you. Thank you to all counsel for your arguments here. It's a complicated and lengthy transcript. We appreciate the arguments and the briefing as well. We're adjourned for the morning. All rise.
judges: B. Fletcher, McKeown, Schwarzer